**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3695
_____

DAVID JAROSLAWICZ

v.

M&T BANK CORPORATION; HUDSON CITY
BANCORP INC.;  *THE ESTATE OF ROBERT G.
WILMERS, BY ITS PERSONAL REPRESENTATIVES
ELISABETH ROCHE WILMERS,  PETER MILLIKEN,
AND HOLLY MCALLISTER SWETT; RENE F. JONES;
MARK J. CZARNECKI; BRENT D. BAIRD; ANGELA C.
BONTEMPO;  ROBERT T. BRADY; T. JEFFERSON
CUNNINGHAM, III; GARY N. GEISEL;  JOHN D.
HAWKE, JR.; PATRICK W.E. HODGSON; RICHARD G.
KING;  JORGE G. PEREIRA; MELINDA R. RICH;
ROBERT E. SADLER, JR.; HERBERT L. WASHINGTON;
DENIS J. SALAMONE; MICHAEL W. AZZARA;
VICTORIA H. BRUNI; DONALD O. QUEST; JOSEPH G.
SPONHOLZ;  CORNELIUS E. GOLDING; WILLIAM G.
BARDEL; SCOTT A. BELAIR

BELINA FAMILY; JEFF KRUBLIT,
                                          Appellants

(*Amended pursuant to Clerk's Order dated 3/1/18)

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. No. 1-15-cv-00897)
District Judge: Honorable Richard G. Andrews
_____

Agued July 17, 2018
_____

Before: McKEE, VANASKIE and SILER, JR.,[*] *Circuit
Judges*
(Opinion Filed:  December 26, 2018)

Deborah R. Gross, Esq. [**Argued**]
Kaufman Coren & Ress
2001 Market Street
Two Commerce Square, Suite 3900
Philadelphia, PA 19103

Francis J. Murphy, Esq.
Jonathan L. Parshall, Esq.
Murphy & Landon
1011 Centre Road
Suite 210
Wilmington, DE 19805

Laurence D. Paskowitz, Esq.

_____

[*] Honorable Eugene E. Siler, Jr., Senior Judge for the
Sixth Circuit Court of Appeals, sitting by designation.

2

Suite 380
208 East 51st Street
New York, NY 10022
    *Counsel for Appellants Belina Family and Jeff Krublit*

George T. Conway, III, Esq.
Bradley R. Wilson Esq. [**Argued**]
Jordan L. Pietzsch, Esq.
Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, NY 10019

John C. Cordrey, Esq.
Brian M. Rostocki, Esq.
Reed Smith
1201 Market Street
Suite 1500
Wilmington, DE 19801
    *Counsel for Appellees M&T Bank Corporation, The
    Estate of Robert G. Wilmers, Rene F. Jones, Mark J.
    Czarnecki, Brent D. Baird, Angela C. Bontempo,
    Robert T. Brady, T. Jefferson Cunningham, III, Gary
    N. Geisel, John D. Hawke, Jr., Patrick W.E. Hodgson,
    Richard G. King, Jorge G. Pereira, Melinda A. Rich,
    Robert E. Sadler, Jr., and Herbert L. Washington*

Tracy R. High, Esq.
Sullivan & Cromwell
125 Broad Street
New York, NY 10004

Kevin R. Shannon, Esq.
Potter Anderson & Corroon

1313 North Market Street
6th Floor
Wilmington, DE 19801

> *Counsel for Appellees Denis J. Salamone, Michael W. Azzara,Victoria H. Bruni, Donald O. Quest, Joseph G. Sponholz, Cornelius E. Golding, William G. Bardel, and Scott A. Belair*

————————————

OPINION OF THE COURT

————————————

VANASKIE, *Circuit Judge*.

After Hudson City Bancorp ("Hudson") merged with M&T Bank Corporation ("M&T"), former Hudson shareholders sued, alleging that the consumer banks had violated securities laws by omitting from their joint proxy materials several facts concerning M&T's purported compliance with pertinent regulatory requirements. The allegations presented two distinct theories of liability. First, because the proxy materials did not discuss M&T's non-compliant practices, M&T failed to disclose significant risk factors facing the merger as required by Item 503(c) of Regulation S-K, 17 C.F.R § 229.503. Second, M&T's failure to discuss the allegedly non-compliant practices in the proxy materials rendered M&T's opinion statements regarding its adherence to regulatory requirements and the prospects of prompt approval of the merger misleading under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). The District Court

4

dismissed the suit on the ground that the allegations failed to plead an actionable omission under either theory.

We disagree in part. We conclude that the shareholders pleaded actionable omissions under Item 503(c) but failed to do so under *Omnicare*. Additionally, we conclude that the shareholders plausibly alleged loss causation and thus reject M&T's alternative ground for affirmance. Accordingly, we will vacate dismissal of the claims concerning mandatory disclosure under Item 503(c) and will affirm dismissal of the claims concerning misleading opinions.

## I. BACKGROUND[1]

This case arises out of the 2015 merger of consumer banks Hudson and M&T. According to former Hudson shareholders, the banks violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 of the Securities Exchange Commission ("SEC"), 17 C.F.R. § 240.14a-9, by omitting several facts concerning M&T's regulatory compliance from their joint proxy materials. The alleged omissions concerned two non-compliant practices: (1) M&T's having advertised no-fee checking accounts but later switching those accounts to fee-based accounts (the "consumer violations"); and (2) deficiencies in M&T's Bank Secrecy Act/anti-money laundering compliance program, particularly its "Know Your

---

[1] These facts are taken mainly from the second amended complaint. (App. A0917–72.) Excerpts from filings are taken from the documents themselves. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that a court may consider a "document integral to or explicitly relied upon in the complaint" when deciding a motion to dismiss).

Customer" program (the "BSA/AML deficiencies"). Beyond these general descriptions, the parties do not provide any more detail about M&T's allegedly non-compliant practices.

## A. The Merger and Accompanying Disclosures

Hudson announced its proposed merger with M&T on August 27, 2012. According to the merger agreement, Hudson shareholders would receive a combination of M&T stock and cash upon the merger's close. The shareholder vote on the proposed merger was scheduled for April 18, 2013.

Prior to the shareholder vote, Hudson and M&T issued a joint Proxy Prospectus (the "Joint Proxy"). The Joint Proxy was filed with the SEC on February 22, 2013 and was mailed to shareholders on or around February 27, 2013. The Joint Proxy contained several references to regulatory compliance. For instance, the Joint Proxy contained a section titled "Regulatory Approvals Required for the Merger." This section provided, in pertinent part:

> Completion of the merger and the bank merger are subject to the receipt of all approvals required to complete the transactions contemplated by the merger agreement [including] from the Federal Reserve Board . . . .

> Although we currently believe we should be able to obtain all required regulatory approvals in a timely manner, we cannot be certain when or if we will obtain

them or, if obtained, whether they will contain terms, conditions or restrictions not currently contemplated that will be detrimental to M&T after the completion of the merger or will contain a burdensome condition.

*Federal Reserve Board.* Completion of the merger is subject, among other things, to approval by the Federal Reserve Board . . . . As part of its evaluation . . . , the Federal Reserve Board reviews: . . . the effectiveness of the companies in combatting money laundering.

(App. A0304–05) (emphasis in original). The "Risk Factors" section of the Joint Proxy addressed the recent increase in banking regulations:

*M&T is subject to extensive government regulation and supervision and this regulatory environment is being significantly impacted by the financial regulatory reform initiatives in the United States, including the Dodd-Frank Act and related regulations.*
. . .

7

The United States government and others have recently undertaken major reforms of the regulatory oversight structure of the financial services industry. M&T expects to face increased regulation of its industry as a result of current and possible future initiatives. M&T also expects more intense scrutiny in the examination process and more aggressive enforcement of regulations on both the federal and state levels. Compliance with these new regulations and supervisory initiatives will likely increase M&T's costs, reduce its revenue and may limit its ability to pursue certain desirable business opportunities.

. . .

Reforms, both under the Dodd-Frank Act and otherwise, will have a significant effect on the entire financial industry. Although it is difficult to predict the magnitude and extent of these effects, M&T believes compliance with the Dodd-Frank Act and its implementing regulations and other initiatives will likely negatively impact revenue and increase the cost of doing business,

both in terms of transition expenses and on an ongoing basis, and may also limit M&T's ability to pursue certain desirable business opportunities. Any new regulatory requirements or changes to existing requirements could require changes to M&T's businesses, result in increased compliance costs and affect the profitability of such businesses. Additionally, reform could affect the behaviors of third parties that M&T deals with in the course of its business, such as rating agencies, insurance companies and investors. Heightened regulatory practices, requirements or expectations resulting from the Dodd-Frank Act and the rules promulgated thereunder could affect M&T in substantial and unpredictable ways, and, in turn, could have a material adverse effect on M&T's business, financial condition and results of operations.

(*Id.* at A0239–41) (emphasis in original).

Additionally, M&T's annual report on Form 10-K for the fiscal year ending December 31, 2011, was incorporated

9

into the Joint Proxy.  The Annual Report discussed M&T's current state of compliance, explaining in part:

> [The USA Patriot Act] imposes obligations on U.S. financial institutions, including banks and broker dealer subsidiaries, to implement and maintain appropriate policies, procedures and controls which are reasonably designed to prevent, detect and report instances of money laundering . . . . The Registrant and its impacted subsidiaries have approved policies and procedures that are believed to be compliant with the USA Patriot Act.

(*Id.* at A1028.)  Although the Joint Proxy discussed the regulatory framework facing consumer banks, it did not mention M&T's allegedly non-compliant practices.

On April 12, 2013, six days before the scheduled shareholder vote, Hudson and M&T filed a proxy supplement, announcing that one of their regulators, the Federal Reserve Board, had identified "certain regulatory concerns with M&T's [BSA/AML] procedures."  (*Id.* at A1041.)  The banks explained that they "expect[ed] additional time [would] be required to obtain a regulatory determination on the application necessary to complete their proposed merger."  (*Id.*)

Three days later, on April 15, 2013, M&T's CFO, René F. Jones, provided an update to investors on the expected delay.

10

Jones explained that M&T "recently [was] made aware" of the fact that the Federal Reserve Board had identified "certain deficiencies in [its] BSA/AML compliance program," which "would impact [M&T's] ability to close the merger . . . in the near term." (*Id.* at A0470.) He also stated that M&T "ha[d] no reason to believe that the issues involve[d] any wrongdoing or illegal conduct by anyone in M&T or any identifiable instances of actual money laundering activity using [M&T]," but that M&T would need to "implement [a] plan [to] improve[]" its compliance programs before approval could be secured and, therefore, it did not "take regulatory approval for granted." (*Id.*) None of the supplemental disclosures mentioned the consumer violations.

Despite the projected regulatory delay, Hudson and M&T decided not to postpone the shareholder vote. On April 18, 2013, Hudson shareholders voted to approve the merger. Regulators eventually approved the merger more than two years later, and the merger closed on November 1, 2015.

### B. Procedural History

In October 2015, David Jaroslawicz, a former Hudson shareholder, filed a putative class action on behalf of Hudson shareholders, claiming, *inter alia*, that the joint proxy materials violated the Exchange Act's prohibition against misleading omissions, 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a). The original complaint named M&T, Hudson, and their directors and officers as defendants.[2] In January 2016, the

---

[2] Since the filing of this lawsuit, Hudson was merged into non-party Wilmington Trust Corp., a wholly-owned subsidiary of M&T. Accordingly, Hudson no longer exists.

11

District Court appointed the Belina Family, former Hudson shareholders, to serve as lead plaintiffs. One month later, the Belina Family and plaintiff Jeff Krublit, another former shareholder, filed an amended complaint.[3]

M&T moved to dismiss the first amended complaint, which the District Court granted. *See Jaroslawicz v. M&T Bank Corp.*, No. 15-897-RGA, 2017 WL 1197716 (D. Del. Mar. 30, 2017). The District Court reasoned that the first amended complaint failed to plausibly allege an actionable omission. However, in light of allegations made for the first time during oral argument, the District Court granted leave to amend so that the shareholders could assert allegations the Court believed constituted misleading omissions. Additionally, the District Court observed, in a conclusory fashion, that the shareholders had plausibly alleged loss causation and negligence.

The shareholders then filed their second amended complaint, adding the allegations which the District Court had identified as potentially relevant. M&T moved to dismiss the second amended complaint. The shareholders objected to the motion as duplicative of the earlier motion to dismiss and, alternatively, argued that the complaint was sufficiently pled. Before resolving the motion, the District Court requested additional briefing on the applicability of Item 503(c) to the Joint Proxy**.** The parties filed a joint response, stating that

---

[3] For ease of reference, we will refer to Plaintiff Jaroslawicz and Plaintiffs–Appellants, the Belina Family and Krublit, as "the shareholders." We will refer to Defendants–Appellees M&T, Hudson, and their directors and officers as "M&T," the "bank," or the "banks."

Schedule 14A, 17 C.F.R. § 240.14a–101, incorporated Item 503(c) and that, therefore, M&T had been required to comply with Item 503(c).

The District Court then granted M&T's second motion to dismiss. *Jaroslawicz v. M&T Bank Corp.*, 296 F. Supp. 3d 670 (D. Del. 2017). After rejecting the shareholders' procedural arguments, the District Court concluded that the second amended complaint failed to plead an actionable omission under either a mandatory disclosure or misleading opinion theory. In particular, the District Court concluded that the complaint failed to plausibly allege that, at the time the proxy materials issued, the consumer violations posed a risk to regulatory approval of the merger. Additionally, the District Court concluded that, as a matter of law, M&T had adequately disclosed in the Joint Proxy the risk that the BSA/AML deficiencies posed to the merger. The District Court was silent with regard to loss causation and negligence. Once again, the District Court granted the motion to dismiss without prejudice, giving the shareholders another opportunity to amend their pleadings**.**

The shareholders elected to stand on their second amended complaint. Shortly thereafter, the District Court dismissed the complaint with prejudice. The shareholders timely filed their Notice of Appeal.

We invited the SEC to participate in the appeal as *amicus*. On July 13, 2018, we received a letter from David R. Fredrickson, Chief Counsel of the SEC's Division of Corporation Finance, declining to participate as *amicus* but providing background information on the legal obligations imposed by the federal securities laws at issue in this case.

13

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1337. We have appellate jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over a district court's decision to grant a motion to dismiss a complaint for failure to state a claim. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1322–23 (3d Cir. 2002). We accept as true all factual allegations contained in the complaint and construe the complaint in the light most favorable to the plaintiffs. *Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 123 (3d Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The District Court reviewed the allegations in the second amended complaint under the general pleading standard set out in Rule 8 of the Federal Rules of Civil Procedure. The shareholders contend that this was proper because their claims sounded in negligence. M&T argues that all § 14(a) claims, even those that sound in negligence, are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1). Ultimately, however, we need not resolve this issue. Neither party has convinced us that the pleading standard is determinative here. This is because the parties do not dispute which statements are alleged to have been misleading; nor do

14

they dispute the specificity of those allegations. Accordingly, our analysis applies with equal force under either standard.

## III. DISCUSSION

The shareholders allege that M&T violated § 14(a) of the Exchange Act and SEC Rule § 14a-9. Section 14(a) of the Exchange Act makes it "unlawful for any person . . . in contravention of such rules and regulations as the Commission may prescribe . . . to solicit or to permit the use of his name to solicit any proxy . . . in respect of any security." 15 U.S.C. § 78n(a)(1). SEC Rule 14a-9 prohibits any solicitation via proxy that "contain[s] any statement which . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." 17 C.F.R. § 240.14a–9(a). "To prevail on a § 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (internal quotation marks omitted). The parties dispute whether the second amended complaint plausibly alleged the first and second elements: a material omission and loss causation.[4]

---

[4] The shareholders assert procedural challenges to the propriety of the second motion to dismiss, contending that: (1) the motion was actually a time-barred motion for reconsideration; and (2) the motion was subject to the bar on successive motions to dismiss under Rule 12(g)(2) of the Federal Rules of Civil Procedure. Both arguments lack merit.

First, the second motion to dismiss was not a motion for reconsideration because the District Court had previously ruled in M&T's favor when it dismissed the first amended complaint without prejudice. In any event, the District Court had the power to reconsider its own interlocutory order. *See United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017) ("Interlocutory orders remain open to trial court reconsideration, and do not constitute law of the case. And the grant of a leave to amend is an interlocutory order.") (citation and alterations omitted). Second, Rule 12(g)(2) prohibits a party from making a successive motion to dismiss if that motion "rais[es] a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). In its second motion to dismiss, M&T either raised new arguments opposing new allegations made in the second amended complaint or renewed arguments from its previous motion seeking to dismiss the first amended complaint. Thus, the arguments raised by M&T in its second motion were either not previously available or not previously omitted. Additionally, it is well-established that if, as here, an amended complaint "contain[s] new information or different allegations making it subject to a defense or objection that was not previously apparent . . . a party may move to dismiss on the basis of the newly discovered ground even if she has filed a Rule 12 motion previously." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1388 (3d ed. 2018). Because it was procedurally proper to consider the second motion to dismiss, the District Court did not err in doing so.

16

We first address whether the second amended complaint plausibly alleged an actionable omission and then consider whether it plausibly alleged loss causation.[5]

---

[5] Additionally, in their briefs and at oral argument, the shareholders repeatedly argued that the District Court erred because it held that securities fraud defendants had no duty to perform due diligence under the federal proxy laws. This argument is unavailing. First, the District Court and the parties agreed that the second amended complaint sounded in negligence. In the context of a § 14(a) claim, we have treated the negligence standard and the duty to conduct due diligence as interchangeable. *Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 777–78 (3d Cir. 1976) (alternatively referring to the standard as a "negligence" standard and a "standard of due diligence"). Second, the shareholders' argument appears to be directed at the District Court's fourth footnote, which states that "[t]he availability of an affirmative defense of due diligence does not create an affirmative duty to perform due diligence." (App. 0019.) The shareholders contend that this statement conflicts with *Gould*'s treatment of the negligence standard as co-extensive with a due diligence standard. In context, however, the District Court was distinguishing another district court case, *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 691–92 (S.D.N.Y. 2004), rather than commenting on the *mens rea* requirement applicable to § 14(a) claims generally. *In re WorldCom* was a Securities Act case brought pursuant to § 11(b), 15 U.S.C. § 77k, and addressed the specific affirmative defense of due diligence, which is unique to that provision and which M&T did not raise here. 345 F. Supp. 2d at 636–67, 659, 662–64.

## A. Whether the Second Amended Complaint Plausibly Alleged an Actionable Omission

"The omission of information from a proxy statement will violate [§ 14(a)] if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement false or misleading." *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006) (internal quotation marks omitted). The shareholders proceeded on both theories. First, they argued that the non-compliant practices posed significant risks to regulatory approval of the merger and therefore that disclosure of those risks was mandated by Item 503(c). Second, they contended that omitted facts related to the non-compliant practices made two statements of opinion contained in the Joint Proxy misleading.

### 1. Theory One: Mandatory Disclosure under Item 503(c)

The parties agree that the Joint Proxy had to comply with Item 503(c). That provision requires issuers to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. 229.503.

Before the District Court, the shareholders argued that, while a reasonable investor might be willing to take some chances with regard to regulatory approval of a merger, she might be less willing to vote for a merger with a company that had committed thousands of consumer violations and maintained a deficient BSA/AML compliance program because of the heightened risk those issues pose to regulatory approval. According to the shareholders, the proxy materials failed to disclose these non-compliant practices. Thus, they

18

argue, the second amended complaint plausibly alleged that M&T violated Item 503(c).

First, we address whether the allegations in the second amended complaint plausibly alleged that the consumer violations presented a significant risk to the merger at the time the proxy materials issued. Second, we explore the scope of adequate disclosure under Item 503(c). Third, we decide whether the proxy materials sufficiently disclosed the alleged risk factors as a matter of law.

*a. The Second Amended Complaint Plausibly Alleged the Consumer Violations Presented a Significant Risk to the Merger*

It is self-evident that an issuer cannot be liable for failing to disclose a risk factor that did not exist at the time of disclosure. *See In re NAHC*, 306 F.3d at 1330 ("To be actionable, a[n] . . . omission must have been misleading at the time it was made . . . ."); *see also Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013) (requiring that plaintiff "allege sufficient facts to infer that a registrant knew, as of [the] time of the offering, that . . . a risk factor existed"). Thus, if the second amended complaint failed to plausibly allege that the consumer violations posed a risk to the merger at the time the Joint Proxy issued, then this claim related to the consumer violations was properly dismissed.

Very few of the allegations in the second amended complaint relate to the consumer violations. The complaint does, however, allege that the practice underlying the violations was curtailed prior to the date the Joint Proxy was filed with the SEC. It also alleges that the Consumer Financial Protection Bureau ("CFPB") eventually took action against

19

M&T for the consumer violations. From these allegations, the shareholders ask us to infer that the consumer violations posed a risk to regulatory approval of the merger, despite cessation of the practice by the time the Joint Proxy issued. The District Court declined to draw such an inference. We, however, conclude that this inference was reasonable and, as such, the pleading standard required the District Court to draw it. Despite the fact that M&T had ceased the practice, it is plausible that the allegedly high volume of past violations made the upcoming merger vulnerable to regulatory delay. Accordingly, the District Court erred when it concluded that the second amended complaint failed to plausibly allege that the consumer violations posed a significant risk to the merger at the time the Joint Proxy issued.[6]

*b. Scope of Disclosure under Item 503(c)*

Nonetheless, M&T may avoid liability if the risks posed by the consumer violations and BSA/AML deficiencies were fully disclosed in the proxy materials. Unsurprisingly, the parties dispute whether these risks were adequately disclosed.

We begin with the text of the regulation itself. Item 503(c) requires issuers, "[w]here appropriate, [to] provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."

---

[6] Regarding whether the BSA/AML deficiencies presented a risk to the merger at the time the proxy materials issued, the District Court assumed this was so, and M&T does not argue otherwise. In any event, independent review of the allegations confirms that the shareholders properly pleaded that the deficiencies did pose a risk to approval of the merger.

20

17 C.F.R. 229.503(c).  With respect to the scope of a sufficient disclosure, Item 503(c) instructs:

> [t]his discussion must be concise and organized logically. Do not present risks that could apply to any issuer or any offering. Explain how the risk affects the issuer or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk.

*Id.*  Additionally, Item 503(c) includes a non-exhaustive list of potential risk factors to be disclosed.  *Id.*  We note that the plain text of the regulation directs issuers to avoid generic disclosures. [7]

Although we have yet to analyze the scope of adequate disclosure under Item 503(c), two of our sister Circuits—the First and the Second—have considered the sufficiency of Item

---

[7] As an aside, the shareholders acknowledge that certain statements relevant to our analysis were made outside of the "Risk Factors" section of the Joint Proxy.  They, however, do not argue that this amounts to a *per se* violation of Item 503(c).  Rather, they assume we may consider these statements and contend that the statements do not provide details sufficient to demonstrate adequate disclosure as a matter of law.

503(c) disclosures as a matter of law.[8]   In *Silverstrand Investments v. AMAG Pharmaceuticals, Inc.*, 707 F.3d 95 (1st Cir. 2013), the First Circuit denied a motion to dismiss, concluding that plaintiffs plausibly alleged that disclosures made in a pharmaceutical company's offering documents were inadequate.  AMAG was a pharmaceutical company marketing Feraheme, "an alternative to current treatments for iron deficiency anemia."  *Id.* at 99.  In its offering documents, AMAG included detailed disclosures about the FDA approval process and the results of Feraheme's clinical trials prior to receiving FDA approval.  *Id.*  However, AMAG did not disclose that it had reported to the FDA at least twenty-three occurrences of severe adverse events ("SAEs") since the drug's inception to market.  *Id.* at 98–100.  When a security analyst publicly reported the SAEs, AMAG's stock plummeted.  *Id.* at 99–100.

The *Silverstrand* plaintiffs argued that Item 503(c) required disclosure of the SAEs.  The First Circuit agreed, opining that "[c]ommon sense . . . dictate[d] that AMAG knew that the riskier Feraheme appeared, the less attractive the drug would be as a method of treatment, and the less likely an investor would be to invest in AMAG, whose profits entirely depended on Feraheme's commercial success."  *Id.* at 104.  Ultimately, the First Circuit concluded that plaintiffs' complaint, which alleged that AMAG failed to disclose the

---

[8] Both Circuits reviewed securities fraud claims brought pursuant to §§ 11 and 12 of the Securities Act, 15 U.S.C. §§ 77k and 77l.  Any distinctions between these statutory provisions and § 14(a) (*i.e.*, the securities filings they address or the participants they make liable) are, however, immaterial for our purposes.

SAEs despite knowing about them, plausibly stated a claim for omission of an Item 503(c) risk factor. *Id.* at 103–06.

The Second Circuit's opinion in *City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014), provides a useful contrast. In that case, the court granted a motion to dismiss, concluding that disclosures regarding tax compliance made in a company's offering materials were adequate as a matter of law. *UBS*, 752 F.3d at 182–88. The plaintiffs alleged that, between 2001 and 2007, UBS engaged in a cross-border scheme wherein Swiss bankers evaded taxes by travelling in and out of the United States to advise clients. *Id.* at 178. In May 2008, the Department of Justice ("DOJ") and the SEC investigated UBS for this conduct and, in 2009, UBS entered into a deferred prosecution agreement ("DPA") with the DOJ and the IRS. *Id.* The DPA stated that UBS had violated United States tax laws and that it had paid a fine of hundreds of millions of dollars. *Id.* In its offering material, UBS disclosed that it was under investigation by the DOJ for its cross-border scheme. *Id.* at 182, 184. However, UBS did not disclose that its cross-border activities were ongoing, nor did it disclose the magnitude of UBS's exposure. *Id.*

Plaintiffs argued that UBS violated Item 503(c) because, "in addition to disclosing the existence of an investigation, defendants were required to disclose that UBS was, in fact, engaged in an ongoing tax evasion scheme." *Id.* at 184. The Second Circuit rejected this argument, holding that plaintiffs failed to plead a cause of action because UBS had satisfied its disclosure obligations under Item 503(c):

23

> As we have explained, "[d]isclosure is not a rite of confession," and companies do not have a duty "to disclose uncharged, unadjudicated wrongdoing." By disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose UBS "to substantial monetary damages and legal defense costs," as well as "injunctive relief, criminal and civil penalties[,] and the potential for regulatory restrictions," UBS complied with its disclosure obligations under our case law.

*Id.* (internal citations omitted).

Read together, these cases suggest that generic disclosures which could apply across an industry are insufficient. Rather, adequate disclosures are company-specific. They include facts particular to a company, such as its financial status, its products, any ongoing investigations, and its relationships with other entities. *See, e.g.*, *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 560–61 (M.D.N.C. 2013) (granting motion to dismiss where risk disclosures "were specific and tailored and fairly addressed the risks that the amended complaint alleges"); *City of Roseville Emps' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 405, 427 (S.D.N.Y. 2011) (denying motion to dismiss where offering materials emphasized company's

24

"unique stewardship initiative" and identified thirteen potential clients, but allegations suggested regulatory agency had rejected similar initiatives and clients had already declined company's services); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 691–92 (S.D.N.Y. 2004) (denying summary judgment for defendants where registration statement repeatedly discussed "the intense competition that WorldCom was facing," but not "the alleged precarious state of WorldCom's profit margins . . . and the impact of that problem on its business as a whole, including its ability to service its debt.").

We next turn to SEC guidance concerning the scope of Item 503(c) disclosures. *Cf. Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 438 (3d Cir. 2018) (finding further support in agency guidance when interpreting an unambiguous statutory provision). This guidance indicates that inadequate disclosure—particularly in the form of disclosing only generic risk factors—presents a persistent problem. The Updated Staff Legal Bulletin released by the SEC in 1999 is illustrative. *See* SEC Division of Corporation Finance: Updated Staff Legal Bulletin No. 7, "Plain English Disclosure," Release No. SLB-7, 1999 WL 34984247 (June 7, 1999). A section of the Bulletin titled "Risk Factor Guidance" leads with the directive that "issuers should not present risks that could apply to any issuer or any offering." *Id.* at *1. Observing that "Item 503(c) seems to be the least understood of the plain English requirements," the Bulletin includes two examples of what the SEC would consider to be sufficient disclosures. *Id.* at *1, *6–7. These examples are highly descriptive and include facts regarding, *inter alia*, each company's finances—including debt and leverage positions—products, market, and competition. *Id.* at

*6–7.  They also describe how certain risks may impact the value of the company.  *Id.*

The Bulletin also provides a heuristic for drafting risk factors.  The SEC explains that Item 503(c) risk factors loosely fall into three broad categories:

> **Industry Risk** — risks companies face by virtue of the industry they're in.  For example, many [real estate investment trusts] run the risk that, despite due diligence, they will acquire properties with significant environmental issues.

> **Company Risk** — risks that are specific to the company. For example, a [real estate investment trust] owns four properties with significant environmental issues and cleaning up these properties will be a serious financial drain.

> **Investment Risk** — risks that are specifically tied to a security. For example, in a debt offering, the debt being offered is the most junior subordinated debt of the company. When drafting risk factors, be sure to specifically link each risk to your industry, company, or investment, as applicable.

*Id.* at *5–6.

Additionally, the Bulletin contains comments frequently issued by SEC investigators when they are confronted with inadequate risk factor disclosures. For example:

> #35 Item 503(c) of Regulation S-K states that issuers should not "present risk factors that could apply to any issuer or to any offering." For example, the risk you disclose under "Dependence on Key Personnel" could apply to nearly any issuer in your industry and even in other industries. If you elect to retain these and other general risk factors in your prospectus, you must clearly explain how they apply to your industry, company, or offering. For example, explain why you are concerned you could lose these key personnel. Are they about to retire? Do you not have employment contracts with them?

*Id.* at *14.

The 1999 Bulletin's focus on making risk disclosures more specific is not unique. As recently as 2016, the SEC sought comments on how to revise its regulations in a way that

would "encourage registrants to describe risks with greater specificity and context[,]" and "discourage registrants from providing risk factor disclosure that is not specific to the registrant but instead describes risks that are common to an industry or registrants in general." *See* Business and Financial Disclosure Required by Regulation S–K, Exchange Act Release No. 33-10064, 81 Fed. Reg. 23916, 23956 (Apr. 22, 2016). We note that the SEC guidance is consistent with the First and Second Circuit's conclusion that a disclosure of risk factors is insufficient if it could apply to any company in a given industry.

Additionally, the shareholders suggest that Item 503(c) incorporates two general obligations beyond what we have described above: (1) a duty to disclose all material facts; and (2) a duty to disclose corporate wrongdoing. Not so.

First, our securities laws do not impose a duty to disclose all material facts. Rather, mandatory disclosures are limited by our holding in *Seinfeld*, in which we explained that "omission of information from a proxy statement" is not actionable unless either "SEC regulations specifically require disclosure of the omitted information" or "the omission makes other statements in the proxy statement materially false or misleading." 461 F.3d at 369 (internal quotation marks omitted); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) (holding that securities laws do not impose a "general duty . . . to provide the public with all material information").

Second, we have never recognized a duty to disclose all corporate wrongdoing in securities filings. *See Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 935 (3d Cir. 1992)

("[S]peculative disclosure is not required under Section 14(a). Wide authority establishes that while pending litigation may be material under certain circumstances, the mere possibility of litigation is not."); *accord UBS*, 752 F.3d at 184 ("Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.") (internal quotation marks and alterations omitted). Rather, a duty to disclose corporate misconduct is only triggered where non-disclosure makes other voluntary statements misleading. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251–52 (2d Cir. 2014) (affirming denial of summary judgment because trier of fact could find omissions regarding ongoing compliance violations may have "render[ed] misleading the comforting statements . . . about compliance measures").

### c. The Proxy Materials Did Not Sufficiently Disclose the Alleged Risk Factors as a Matter of Law

Having explored the scope of adequate disclosure under Item 503(c), we consider whether the District Court erred in applying this regulation to the allegations in the second amended complaint. The District Court did not discuss whether the risks posed by the consumer violations were sufficiently disclosed. Similarly, the District Court did not decide whether the supplemental disclosures cured any alleged omissions in the Joint Proxy. The District Court did, however, conclude that the statements made in the Joint Proxy sufficiently disclosed the risks related to the BSA/AML deficiencies as a matter of law.

Regarding the consumer violations, the Joint Proxy did not make any reference to the fraudulent practice underlying the violations, the dates the practice was in place, the extent of consumer accounts affected by the practice, or the subsequent

29

CFPB investigation into the practice. Rather, in the section labelled "Regulatory Approvals Required for the Merger," the Joint Proxy reminded shareholders that "[c]ompletion of the merger and bank merger are subject to the receipt of all approvals required to complete the transactions contemplated by the merger agreement . . . ." (App. A304.) The Joint Proxy further warned:

> Although we currently believe we should be able to obtain all required regulatory approvals in a timely manner, we cannot be certain when or if we will obtain them or, if obtained, whether they will contain terms, conditions or restrictions not currently contemplated that will be detrimental to M&T after the completion of the merger or will contain a burdensome condition.

(*Id*.)

The shareholders' allegations plausibly suggested that the Joint Proxy's disclosures concerning the consumer violations were too generic to be adequate. Most strikingly, the Joint Proxy's statements are not company-specific. For instance, the "Regulatory Approvals Required for the Merger" section could easily apply to any consumer bank in the industry considering a merger. *See In re WorldCom*, 346 F. Supp. 2d at 691–92 (denying summary judgment where offering documents referenced competition generally, rather than

30

details of company's indebtedness, lack of cash flow, and underperforming stock).

While it is possible that the supplemental disclosures cured any inadequate disclosures in the Joint Proxy, the supplemental disclosures related exclusively to the BSA/AML deficiencies and did not address the consumer violations. Accordingly, we conclude that the shareholders alleged a plausible claim for relief under Item 503(c) regarding M&T's inadequate disclosure of the consumer violations.

Regarding the BSA/AML deficiencies, the Joint Proxy did not discuss them expressly. It did not describe M&T's "Know Your Customer" program, its claimed deficiencies, the number of customer accounts affected by the program's deficiencies, the Federal Reserve Board investigation, or the costs of remediation. The Joint Proxy did, however, mention anti-money laundering compliance. For example, the Joint Proxy explained that completion of the merger was subject to approval by the Federal Reserve Board. According to the Joint Proxy, "[a]s part of its evaluation of these factors, the Federal Reserve Board reviews: . . . the effectiveness of the companies in combatting money laundering." (App. A0305.) As with the consumer violations, it is plausible that these boilerplate disclosures were too generic to communicate anything meaningful about this specific risk to the merger.

Unlike the consumer violations, however, the BSA/AML deficiencies are addressed in the supplemental disclosures. Specifically, M&T stated in the supplemental disclosures that it was the subject of a Federal Reserve Board investigation regarding its BSA/AML compliance. M&T warned that the investigation would likely result in delay of

31

regulatory approval of the merger and, by extension, closing of the merger. The substance of these disclosures was likely adequate as a matter of law. As in *UBS*, M&T disclosed the pertinent fact—*i.e.*, that it was the subject of an investigation that could impact the closing of the merger. *See* 752 F.3d at 184 (holding disclosure of ongoing FBI investigation into UBS was sufficient despite absence of details of scheme under investigation). Because "[d]isclosure is not a rite of confession," *id.*, M&T was likely not required to dive into the weeds and provide details of the shortcomings of its "Know Your Customer" program.

Even if the supplemental disclosures were sufficient with respect to the BSA/AML deficiencies, however, the shareholders dispute that the supplemental disclosures were disseminated in a way that guaranteed adequate disclosure. The SEC has long recognized that it is "of overriding importance . . . that shareholders be given timely and accurate information of material changes" occurring since the proxy was filed. Staff Report on Proxy Solicitations, Exchange Act Release No. 34-16343, 8 SEC Docket 927 (Nov. 27, 1979). However, "[t]he manner in which those responsible for solicitation of proxies elect to correct information which has proven incorrect due to subsequent circumstances, must, of necessity, be dictated by the individual set of circumstances that exist." *Id.* According to the shareholders, the six days between the first supplemental disclosure, issued on April 12, 2013, and the April 18 shareholder vote was not enough time for a reasonable investor to digest the information. M&T counters by arguing there is no hard and fast deadline for filing supplemental disclosures.

While we agree that there is no deadline for filing a supplemental disclosure, we are not prepared to say the six days provided here was adequate as a matter of law. Rather, we think the effect of the supplemental disclosures raises a fact issue, which precludes dismissal of the BSA/AML allegations at this time.

Accordingly, we will vacate the District Court's dismissal of the mandatory-disclosure claims relating to both the consumer violations and the BSA/AML deficiencies.

## 2. Theory Two: Misleading Opinions

In their second theory of liability, the shareholders argue that two statements of opinion contained in the Joint Proxy—that M&T believed the merger would close timely and that M&T believed its BSA/AML program was compliant with the Patriot Act—are actionable under *Omnicare*.

In *Omnicare*, the Supreme Court held that an opinion is only misleading under an omissions theory if the speaker "omits material facts" about its "inquiry into or knowledge concerning a statement of opinion" that "conflict with what a reasonable investor would take from the statement itself." 135 S. Ct. at 1329. Satisfying this standard, the Court warned, is "no small task." *Id.* at 1332. To illustrate, the Court considered the hypothetical statement: "We believe our conduct is lawful." *Id.* at 1328. According to the Court, a reasonable investor may assume an issuer consulted a lawyer before forming such an opinion. *Id.* A reasonable investor may also assume that the lawyer concurred with the substantive assessment. *Id.* at 1328–29. In other words, reasonable investors may expect compliance opinions to be both supported by "meaningful legal inquir[ies]" and to "fairly align[] with the information in

33

the [speaker's] possession at the time." *Id.* If the issuer did not consult a lawyer, or if the lawyer did not agree with the assessment, the issuer's opinion regarding its compliance "could be misleadingly incomplete." *Id.* at 1328.

The Court also recognized that not every omission related to a speaker's knowledge or process in forming an opinion is misleading. "An opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 1329. This is because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; . . . [a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Id.* Accordingly, plaintiffs must "identify particular (and material) facts going to the basis for the [speaker's] opinion—facts about the inquiry [the speaker] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1332. A conclusory allegation that the speaker "lacked 'reasonable grounds for the belief' it stated" will not suffice. *Id.* at 1333.

We have yet to decide whether *Omnicare* applies to claims brought under the Exchange Act, and in particular under § 14(a). *Cf. In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 132 n.12 (3d Cir. 2017) ("[W]e decline to decide whether *Omnicare* is applicable to § 10(b) claims . . . ."). We decline to do so again today because, even assuming *Omnicare*'s applicability, the shareholders failed to plausibly allege an actionably misleading opinion.

34

Here, the shareholders contend that two opinion statements made in or incorporated by reference into the Joint Proxy violated *Omnicare*. The statements read as follows:

> [1] Although we currently *believe* we should be able to obtain all required regulatory approvals in a timely manner, we cannot be certain when or if we will obtain them or, if obtained, whether they will contain terms, conditions or restrictions not currently contemplated that will be detrimental to or have a material adverse effect on M&T or its subsidiaries after the completion of the merger.
>
> .  .  .
>
> [2] The Registrant and its impacted subsidiaries have approved policies and procedures that are *believed* to be compliant with the USA Patriot Act.

(App. A0220, A1028) (emphasis added). The shareholders argue that these opinion statements are misleading because: (1) they proved to be false; and (2) the Joint Proxy omitted facts concerning M&T's process for forming these opinions.

The shareholders' first argument is meritless. They contend that the opinion statements are actionable because they were ultimately proved to be false—in other words, regulatory

35

approval was *not* obtained in a timely manner; and M&T was *not* compliant with the Patriot Act. A similar argument was rejected by the Supreme Court in *Omnicare*: "[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of]whether an investor can ultimately prove the belief wrong." 135 S. Ct. at 1327.

The shareholders' second argument, though stronger, is ultimately unpersuasive. Apart from asserting, in conclusory fashion, that the banks acted negligently, the second amended complaint specifically alleges that M&T conducted "intensive due diligence" of Hudson's operations from June 2012 to August 27, 2012. (App. A0935.) The complaint also alleges that Hudson's due diligence investigation into M&T began on August 20, 2012 and lasted at most five business days. It does not allege particular facts about the banks' conduct during those investigations. However, it does allege that sampling would have revealed the BSA/AML deficiencies—the implication being that the banks did not sample M&T's customer accounts. From these allegations, the shareholders ask us to infer that the banks did not conduct a meaningful inquiry before forming their opinions.

The first shortcoming in this argument is that the facts concerning the duration of the diligence period were disclosed in the Joint Proxy. "[T]o avoid exposure for omissions," a speaker "need only divulge an opinion's basis, or else make clear the real tentativeness of its belief." *Omnicare*, 135 S. Ct. at 1332. Even if a reasonable investor would have expected the banks to conduct a lengthier due diligence period, the Joint Proxy provided her with enough information to understand that the banks did not do so here.

What remains, then, are general allegations of inadequate diligence and one specific allegation that the banks did not conduct a sampling of M&T's customer accounts. Because general allegations of negligence are insufficient to plead an *Omnicare* violation, *see id.* at 1333, we are left with the question of whether a reasonable investor would have expected the banks to conduct a sampling of customer accounts. We think this solitary allegation concerning sampling is too weak to defeat the motion to dismiss.

First, *sampling* is a generic term that merely describes the act of selecting a subset of a much larger set one wishes to study. The second amended complaint does not explain the method of sampling—*i.e.*, how individual accounts should have been selected—nor does it describe the type of review to be conducted once an account was selected by this method. Second, sampling is presumably just one of several ways to conduct due diligence; nothing in the complaint suggests that sampling was the only way to conduct diligence here. Without more, we do not think it plausible that a reasonable investor would have expected the banks to conduct a sampling of customer accounts; nor do we think it is plausible that a reasonable investor would have been misled by the banks' failure to disclose that a sampling was not conducted.

The context of the opinions at issue further underscores our conclusion that a reasonable investor would not have been misled. The opinions were made in the context of the Joint Proxy's description of the increased scrutiny into BSA/AML compliance across the industry. The opinions are also surrounded by cautionary language, warning of the uncertainty of future projections regarding regulatory approval. This hedging is similar to that which was persuasive to the Supreme

37

Court in *Omnicare*, and suggests to us that a reasonable investor would not have been misled by the opinions.

Accordingly, we will affirm the District Court's dismissal of the misleading-opinion claims.

### B. Whether the Second Amended Complaint Plausibly Alleged Loss Causation

We conclude by addressing M&T's alternative ground for affirmance: the shareholders' alleged failure to plead loss causation. *See Hassen v. Gov't of V.I.*, 861 F.3d 108, 114 (3d Cir. 2017) (acknowledging that we may affirm on any ground supported by the record). "The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007) (analyzing § 10(b) claim). To plausibly allege loss causation, a "plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *Id.* "[R]ecovery is not limited to out of pocket loss, a diminution in the value of one's investment, but may include loss of a possible profit or benefit, an addition to the value of one's investment, unless the loss is wholly speculative." *Gould*, 535 F.2d at 781, 782 (recognizing "that by the circulation . . . of the defective proxy materials the plaintiffs were lulled to inaction and thereby suffered the loss of an opportunity to attempt to secure a merger agreement which would be more favorable to them").

The District Court did not address whether the second amended complaint plausibly alleged loss causation. The District Court did, however, find that the first amended complaint plausibly alleged loss causation, and the allegations

38

regarding loss are identical in both pleadings. The shareholders maintain three theories of loss on appeal: (1) the lost opportunity of a more favorable merger premium; (2) the lost opportunity of a higher dividend; and (3) the lost opportunity of investing in a company without—to use the language of the complaint—M&T's "spotty regulatory record." (App. A0926.) M&T counters that there was no loss as a matter of law because: (1) the shareholders profited from the merger to the tune of $1.9 billion; (2) the shareholders' more-favorable-merger-premium theory is "entirely speculative" in that there was no competing offer and no reason to believe the shareholders would have rejected the merger but for a more favorable premium; (3) the shareholders' higher dividend theory is "too attenuated" in that Hudson's Board had complete discretion to issue a dividend; (4) the alleged dividends were dispensed between the shareholder vote and the merger's closing and so cannot be attributed to the merger; and (5) despite an allegedly "spotty regulatory record," M&T's stock price rose after the merger closed. (Appellees' Br. at 45–48.)

While it is true that the shareholders earned a profit after the merger closed, this does not necessarily negate any alleged lost opportunities. *See Gould*, 535 F.2d at 781. On the other hand, we agree that the shareholders' loss allegations border on speculative. Although loss causation may ultimately be difficult for the shareholders to establish, we will not say that the shareholders' allegations are facially implausible. Where, as here, resolution is likely to turn on the specifics of the merger negotiations and the inferences that should be drawn therefrom, we think dismissal would be premature. Accordingly, we find that the shareholders' allegations of loss causation are sufficient to survive the motion to dismiss.

## IV. CONCLUSION

For the foregoing reasons, we will vacate in part and affirm in part the District Court's Order dated November 21, 2017. On remand, the District Court is directed to proceed to discovery on the mandatory-disclosure claims.